## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**SHANGHAI WESTON TRADING CO., LTD.,**

               **Plaintiff,**                  **Case No. 1:23-cv-117**

                                                 **JUDGE DOUGLAS R. COLE**

     **v.**

**TEDIA COMPANY, LLC,**

               **Defendant.**

### OPINION AND ORDER

Contract law deals with enforcing an exchange of promises. However, "a promise merely in form, but in actuality not promising anything, … cannot serve as consideration" for the formation of a contract, and thus cannot provide a legal basis for a breach of contract claim. 3 Williston on Contracts § 7.7 (4th ed. 2023). This case tasks the Court with evaluating whether the parties in actuality promised anything.

Before the Court is Defendant Tedia Company, LLC's (Tedia) partial motion to dismiss. (Doc. 21). Tedia seeks dismissal of Plaintiff Shanghai Weston Trading Co., Ltd.'s (Shanghai Weston) contract-based claims because Tedia believes its agreement denominating Shanghai Weston its exclusive distributor in China is unenforceable for two reasons. First, it lacks necessary terms describing Tedia's obligations. And second, Shanghai Weston has promised nothing in return, thereby rendering the contract illusory. Separately, Tedia seeks a dismissal of Shanghai Weston's fraud claim. Tedia argues that the fraud claim is actually a recast breach of contract claim and that it owed Shanghai Weston no duty to disclose its negotiations over the sale

of its business interests to a third party when it accepted purchase orders from Shanghai Weston.

As explained further below, at this stage of the litigation and based on the allegations in the Complaint, the Court disagrees with Tedia that the exclusive distributor agreement is not a valid contract. But the Court agrees with Tedia that it owed Shanghai Weston no duty to disclose the potential sale of its business. So Shanghai Weston's fraud claim fails as a matter of law, but its contract-based claims survive dismissal. As a result, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Dismissal of Complaint (Doc. 21) under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** only Count X (Fraud) of Plaintiff's Verified Complaint for Injunctive Relief, Declaratory Judgment, and Compensatory and Punitive Damages (Doc. 1).

## BACKGROUND[1]

Tedia, a chemical solvent producer, originally worked hand-in-hand with Shanghai Weston, its designated Chinese distributor. (Doc. 1 ¶¶ 11–12, #4). This distributor relationship began in November 1998 and continued uninterrupted through the end of the 2022 calendar year when the business relationship collapsed. (*Id.* ¶¶ 12–13, 57–58, #4, 10–11). During that time, in 2011, Tedia expanded its manufacturing operations in Asia by becoming the controlling shareholder of Anhui Tedia High Purity Solvents Co., Ltd. (Anhui)—the company Tedia then used to

---

[1] As this matter comes before the Court on a motion to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations.

produce its chemical solvents in China. (*Id.* ¶¶ 4, 25–29, #2, 6–7). Shanghai Weston alleges that when this expansion of production occurred, Tedia expanded the Tedia/Shanghai Weston distributor arrangement to cover all products its new subsidiary, Anhui, produced. (*Id.* ¶¶ 4, 31–32, #2, 7).

Shanghai Weston alleges that Tedia designated Shanghai Weston as the exclusive distributor via "an Exclusive Distributor Agreement, which is evidenced by a series of [documents styled as] certificates of exclusive distributor agreements" that Tedia issued nine times during the course of the business relationship between the parties. (*Id.* ¶¶ 1, 12–13, 22, 33, 37, #2, 4–8; Docs. 1-1 to 1-9). Each certificate was on Tedia letterhead, and several were addressed "To Whom It May Concern." Through the certificate, Tedia "certif[ied]" that Shanghai Weston would be "Tedia's exclusive distributor in China." (Docs. 1-1 to 1-9). The certificate then went on to state that the exclusive arrangement to which the certificate referred would provide Shanghai Weston certain rights. The exact language varied, but the 2013 certificate is illustrative. It provides that the distributor agreement would grant Shanghai Weston "exclusive[] authoriz[ation] to purchase from Tedia, [and to] market and [to] sell Tedia products in China."[2] (Docs. 1-8, 1-9). Only Tedia signed these certificates. (Docs. 1-1 to 1-9). Early certificates set a timeframe for how long the exclusivity agreement would remain in force by noting the specific expiration date for the agreement. (Docs. 1-1 to 1-7). And consistent with those expiration dates, Tedia meticulously reaffirmed

---

[2] Earlier versions used "entitled to sell, [to] accept and [to] process orders" in place of the "purchase … market and sell" language. (*E.g.*, Doc. 1-4).

the exclusivity of Shanghai Weston's distributorship so that it appears to have continued unrevoked for the duration of their business relationship.

The last two certificates, issued in 2013 and 2018, respectively, contained slight wording changes but continued the trend. In these certificates, Tedia again certified that Shanghai Weston was Tedia's exclusive distributor in China. But it also noted that such exclusivity was also authorized "on behalf of" Anhui. (Doc. 1-8, #44; Doc. 1-9, #46). And while the previous certificates had expressly stated when the "agreement" expired, the last two certificates defined when the "certificate" expired.[3] (Doc. 1-8, #44; Doc. 1-9, #46). The last-signed certificate said it would "expire[] on December 31, 2023. (Doc. 1-9, #46).

Yet Tedia allegedly changed its mind about Shanghai Weston's exclusive distributorship and is claimed to have abandoned the arrangement in December 2021. (Doc. 1 ¶ 76, #13). This alteration stems from Tedia's sale of its ownership interests in Anhui, along with its Chinese trademark "Tedia," to a Chinese company named Shanghai Titan Technology Company, Ltd. (Titan). (*Id.* ¶¶ 69, 71, #12). Titan allegedly purchased all Tedia products through Shanghai Weston before Titan bought Anhui. (*Id.* ¶ 70, #12). But after the sale was consummated, Tedia allegedly began

---

[3] In the Complaint, Shanghai Weston sometimes appears to conflate the certificates themselves with the exclusivity agreement—for example, alleging that "[t]he 2018 certificate stated that the 'certificate [i.e., the Agreement] is in effect January 1, 2019, to December 31, 2023." (Doc. 1 ¶ 39, #8). But the clear import of the Complaint read as a whole and in the light most favorable to Shanghai Weston, as the Court must do at this stage of the litigation, *Pegram v. Herdrich*, 530 U.S. 211, 230 & n.10 (2000), is that the certificates memorialize the existence of an exclusivity agreement—not that they constitute the written instrument containing the entire agreement and its terms. (Doc. 1 ¶¶ 1, 74–75, #2, 13 (alleging the certificates "evidenced" the exclusivity agreement)).

"marketing and selling Tedia Products in China" through Titan, thereby rendering Titan a competitor (rather than a customer) of Shanghai Weston and purportedly breaching the exclusivity arrangement Shanghai Weston had enjoyed with Tedia. (*Id.* ¶¶ 77–83, #13–14).

Shanghai Weston's claimed problems with Tedia were not limited solely to the alleged nullification of the exclusive distributorship under which it had operated. According to Shanghai Weston, Tedia accepted three purchase orders submitted by Shanghai Weston in late 2021—on September 17, 2021, October 5, 2021, and November 13, 2021, respectively—none of which were ultimately fulfilled. (*Id.* ¶¶ 42–47, 50, #8–9; Docs. 1-10 to 1-15). Beyond decrying Tedia's alleged breach of these purchase orders, Shanghai Weston alleges that Tedia never intended to fulfill those orders even when it accepted them. (*Id.* ¶ 142, #22). As Shanghai Weston tells it, Tedia's acceptance of the purchase orders was concurrent with its talks to sell Anhui to Titan—the sale executed in December 2021—which talks were not disclosed to Shanghai Weston until September 2022. (*Id.* ¶¶ 143–44, #23). By withholding the existence of these negotiations from Shanghai Weston, Tedia allegedly "concealed important information from [Shanghai] Weston with the intent to mislead [Shanghai] Weston into relying" on the validity of the purchase orders. (*Id.* ¶ 145, #23). And Shanghai Weston claims that because the purchase orders were not fulfilled, it has been defrauded resulting in some amount of damages—purportedly measured by the costs associated with the unfulfilled orders and the "unfair advantage against [Shanghai] Weston" that Titan allegedly obtained by purportedly "creat[ing] market

confusion as to who [wa]s the authorized distributor" of Tedia's products in China. (*Id.* ¶¶ 146, 148, #23–24).

Based on these allegations, Shanghai Weston sued Tedia on February 27, 2023. In the Complaint, Shanghai raised eleven claims: claims for (1) preliminary and permanent injunctions (Count I); (2) breach of the exclusivity agreement (Count II); (3) breach of the purchase orders (Count III); (4) promissory estoppel arising out of the exclusivity agreement (Count IV); (5) promissory estoppel arising out of the purchase orders (Count V); (6) unjust enrichment (Count VI); (7) Tedia's tortious interference with the exclusivity agreement as it pertained to Anhui (Count VII); (8) Tedia's tortious interference with Shanghai Weston's business relationship with Anhui (Count VIII); (9) conversion (Count IX); (10) fraud (Count X); and (11) declaratory relief (Count XI). (*Id.* ¶¶ 87–155, #14–25). As a result of these claims, Shanghai Weston requests compensatory and punitive damages, injunctive and declaratory relief, as well as costs and fees. (*Id.* at #25–28). Shortly after Tedia entered its appearance, Shanghai Weston moved for a temporary restraining order, expedited discovery, and a preliminary injunction against Tedia's continued use of Titan to distribute its Anhui products. (Docs. 11-13). After holding an informal preliminary telephone conference regarding these motions, the Court granted Shanghai Weston's temporary restraining order on March 16, 2023. (Doc. 14). The Court then granted the parties' agreed-to preliminary injunction order on April 7, 2023, which relief was limited to barring Tedia's shipping Tedia products *in China* through any distributor other than Shanghai Weston. (Docs. 18, #286–87).

6

Following the Court's entry of the agreed-to preliminary injunction order, Tedia moved to dismiss Count II (breach of contract arising out of the exclusivity agreement), Count VII (tortious interference with the exclusivity agreement as it pertained to Anhui), and Count X (fraud), for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). (Doc. 21). Specifically, it argues that breach of contract claim fails because the exclusivity agreement lacks material terms and because Shanghai Weston provided no consideration for the alleged contract. (*Id.* at #298–303). Tedia then argues that the tortious interference claim necessarily fails as a result because, absent a contract between Anhui and Shanghai Weston, Tedia could not tortiously interfere. (*Id.* at #303). And it argues that the fraud claim fails because the claim is merely a recast breach of contract claim and because Tedia owed Shanghai Weston no duty to disclose the allegedly withheld information. (*Id.* at #304–06). Shanghai Weston opposed (Doc. 24), and Tedia filed its reply (Doc. 25).[4]

The matter is now ripe for the Court's review.

---

[4] Tedia's reply brief makes a passing reference to requesting the Court "*sua sponte* [to] strike the Declaration attached to Shanghai Weston's Opposition as improper." (Doc. 25, #425). The Court does not consider this request as Tedia did not formally move to strike the declaration and included the request in its reply without providing Shanghai Weston an opportunity to respond. *See Bard v. Brown Cnty.*, 970 F.3d 738, 750–51 (6th Cir. 2020). And the Court finds that striking the declaration is unnecessary. The Court expressly confined its review, as it must at this stage in the litigation, to only the well-pleaded factual allegations. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023). And because the declaration played no role in the Court's disposing of Tedia's motion, the appropriate action "is not to strike that filing, but to disregard it." *Bloodworth v. Pouperd*, No. 3:20-cv-2424, 2022 WL 716099, at *2 (N.D. Ohio Mar. 10, 2022). That said, the Court reminds Shanghai Weston that evidence beyond the pleadings, judicially noticeable facts, written instruments, and documents incorporated by reference in the Complaint are properly considered by the Court only when presented with a motion for *summary judgment*. *See* Fed. R. Civ. P. 12(d).

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up). But while well-pleaded allegations are accepted as true, they are just that—allegations.

## LAW AND ANALYSIS[5]

As noted, Tedia's motion to dismiss addresses only three claims raised in the Complaint: the claims for breach of the exclusivity agreement, tortious interference with the exclusivity agreement, and fraud. The Court evaluates each in turn.

---

[5] Both parties assume Ohio law applies without engaging in a choice-of-law analysis. While choice of law is not a jurisdictional issue, the Sixth Circuit has tacitly suggested that courts should nonetheless evaluate the issue—but "not [to] delve too deeply" when "all parties have acquiesced[]without comment." *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998). The need to evaluate choice of law makes intuitive sense because, after all, what law the Court must apply as a rule of decision is "an issue antecedent to … [resolving the merits of] the dispute before it." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (cleaned up). So the Court may analyze choice-of-law even if "the parties fail to identify and [to] brief" it given the Court "retains the independent power to identify and [to] apply the proper construction of governing law, even where the proper construction is that a law does not govern" the dispute. *Id.* at 446–447 (cleaned up).

Under Ohio law, which governs the choice-of-law rules that the Court must apply here, *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941), the Court looks to Section 188 of

A.      **Count II – Breach of the Exclusivity Agreement**

As stated above, Shanghai Weston claims that Tedia violated the exclusivity agreement—evidenced by the certificate Tedia issued in 2018—by shifting its distribution of Tedia products in China from Shanghai Weston to Titan. (Doc. 1, #16). Tedia mounts two attacks to the legal validity of this contract claim. It first argues that the exclusivity agreement is invalid because material terms are missing from the certificates—documents that Tedia contends do not merely *evidence* a contract, but in fact *are* the alleged contract. (Doc. 21, #298–302). Second it argues that no

---

the Restatement (Second) of Conflict of Laws to evaluate what law applies—a question that turns on which forum has the "most significant relationship to the transaction and the parties," *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 209 (Ohio 2001). To evaluate this issue, the Court "should consider the place of contracting, the place of negotiation, the place of performance, the location of the subject matter, and the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Id.* On the limited record before the Court—the well-pleaded factual allegations in the Complaint—the Court finds that the parties' wordless acquiescence to Ohio law is reasonable and warranted. Although Shanghai Weston is a Chinese company with a specific focus on distributing chemical solvents in China, Tedia retains its principal place of business here in Ohio. (Doc. 1 ¶¶ 8–9, #4). The evidence of the contracts at issue in this dispute strongly suggest that acceptance and consummation of those agreements occurred here in Ohio—Tedia issued the certificates confirming the exclusivity agreement from Ohio, and it accepted the proposed purchase orders, which were sent to Tedia's headquarters in Ohio, from an Ohio address. (*E.g.*, Doc. 1-1; Doc. 1-11, #52). And although these agreements will eventually be performed in China—the agreements are about Shanghai Weston's sale and distribution of Tedia's goods in China—the initial inception and nexus of the contracting occurred in Ohio, and it is Tedia's actions under (or in contravention of) these agreements from its headquarters in Ohio that form the heart of this dispute. For the Court's analysis of the conflict-of-law issue without "delv[ing] too deeply" into it at this stage of the litigation, that record is sufficient to establish that "no injustice [would be] wrought by applying [Ohio] law to these acquiescent litigants." *GBJ Corp.*, 139 F.3d at 1085 (concluding that New York law applied given the company "at the center of this case" was a New York business and "the negotiations at issue took place in New York"). The Court notes, however, that its disposition of this issue is subject to reconsideration and revision. Should evidence be adduced during discovery that changes the choice-of-law calculus—for instance, evidence that the contracts had choice-of-law provisions or that negotiations actually took place in another forum—the Court will reevaluate its legal determination on that record after briefing and argumentation from the parties. The Court's conclusion here rests solely on the record presently before it.

contract exists because the alleged arrangement lacks mutual consideration. In particular, the promise set forth in the certificate—an exclusive distributorship—operates only to Tedia's detriment; it imposes no corresponding obligation on Shanghai Weston, which means there is no bargained-for exchange. (*Id.* at #302–03). Neither argument carries the day.

Start with the claim that the contract is missing material terms. Tedia argues that because the 2018 certificate does not specify a quantity term, Ohio law will recognize such a contract only if it is either a requirements contract or an output contract.[6] (*Id.* at #298–99). As Tedia correctly notes, exclusivity is the touchstone of either. Output contracts require a seller to sell all of its output *exclusively* to a single buyer. *H&C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 41 N.E.3d 915, 924–25 (Ohio Ct. App. 2015). A requirements contract is similar, but it is an agreement that the buyer will buy all of its required goods *exclusively* from a given seller. *Id.* at 923–24.

Relying on the exclusivity requirement for a valid requirements contract, Tedia makes two interrelated arguments. First, Tedia argues that according to the 2018 certificate, Shanghai Weston need not purchase chemical solvents exclusively from

---

[6] As explained below, Ohio law, via its adoption of the Uniform Commercial Code, also recognizes and enforces exclusive dealing contracts, which include exclusive distributorship agreements for the sale of goods. Ohio Rev. Code § 1302.19(B); *Irwin Indus. Tool Co. v. Worthington Cylinders Wisc., LLC*, 2009 WL 606218, at *18–*19 (W.D.N.C. Mar. 9, 2009) (applying Ohio law); *see generally Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 611–12 (6th Cir. 2001) (concluding that under Ohio law, distributorship contracts premised on the sale of goods are governed by the Uniform Commercial Code). And this is so, even if the exact quantity term is not strictly provided for in the contract, since "[u]ncertainty as to the number of [goods] to be ordered … [can be] capable of ascertainment after performance." *Bach v. Friden Calculating Mach. Co.*, 155 F.2d 361, 364–65 (6th Cir. 1946) (explaining that this rule of decision has been followed in Ohio and is applicable to an exclusive distributorship over the sale of calculating machines in a designated territory covering Cincinnati).

10

Tedia, which places the contract outside the realm of a valid requirements contract. (Doc. 21, #301; Doc. 25, #425–26). Then, it contends that because the contract was non-exclusive, a specified mechanism to establish the quantity of goods to be distributed needed to be fairly included in the terms of the 2018 certificate but there is no such mechanism present. (Doc. 21, #300–01; Doc. 25, #423).

There are two conspicuous problems with these arguments. Begin with the most evident. As the Court noted above, reading the Complaint in the light most favorable to Shanghai Weston, the 2018 certificate "evidenced"—did not constitute, but merely evidenced—the actual exclusivity agreement between the parties. *See supra* note 3. Tedia's argument, though, necessarily assumes that the certificate *is* the contract, or in other words that the certificate itself must contain all of the material terms necessary to form a valid exclusivity agreement. If, to the contrary, the certificate merely confirmed the existence of some other underlying agreement, an agreement extending beyond the terms solemnized in the certificate itself, then the argument fails out of the box. *Cf. Tubelite Co. v. Original Sign Studio, Inc.*, 891 N.E.2d 820, 824–25 (Ohio Ct. App. 2008) (describing the differences between confirmatory writings and the contract itself).

Here, the Complaint's well-pleaded allegations create a plausible inference that those independent terms existed—that there was an agreement (whether written or oral) beyond the terms contained in the certificate itself. For example, the parties are claimed to have labored under an exclusivity arrangement without interruption—and without objection to this course of dealing—for over two decades,

11

(Doc. 1 ¶¶ 19, 22, 33, 37, 76, #5–6, 7–8, 13). *See Metal Seal Precision, Ltd. v. Good Time Outdoors, Inc.*, 128 N.E.3d 678, 687 (Ohio Ct. App. 2018) (explaining that under Ohio Revised Code § 1302.05, which Ohio adopted as part of its enactment of the Uniform Commercial Code (UCC), the parties may "*explain* or *supplement*" the terms included in confirmatory memoranda and contracts with their course of dealing, such as when "the writing is not 'a complete and exclusive statement of the agreement'" (citation omitted)).[7] Because the Complaint plausibly alleges that there is an underlying exclusivity agreement that included terms beyond those memorialized in the 2018 certificate, and because the Complaint contains sufficient factual allegations to render plausible the inference that the full agreement included all relevant material terms, Tedia's contention that the contract lacks the necessary material terms fails at this stage.[8]

---

[7] And that the parties can use their past course of dealing to elucidate the terms of the claimed contract explains why Tedia's arguments about the perceived lack of a quantity term fall short of requiring a dismissal of Shanghai Weston's claim for breach of the exclusivity agreement at this early stage of the litigation. (Doc. 21, #300–01). Evidence of Tedia's historic sales of chemical solvents to Shanghai Weston under this exclusivity arrangement over the two decades it was in place could reasonably explicate what "good faith" quantity was anticipated to be produced and sold by Tedia and then distributed by Shanghai Weston in China. *See* Ohio Rev. Code § 1302.19(A) (defining the quantity term of an output contract as "such actual output [of the seller] … as may occur in good faith").

[8] That said, the Court should not be understood to be finding that a separate agreement in fact exists, that if it does that it contains all necessary terms, or that if the separate agreements is an oral contract, that there are no other defenses, such as the difficulties of enforcing oral contracts under the statute of frauds, that may apply. None of these potential arguments are currently before the Court. Because Tedia's briefing focused solely on attacking the validity of the exclusivity agreement by homing in on only the terms as memorialized in the 2018 certificate, the Court has had no occasion to evaluate other possible legal issues. Simply put, the Court is relying on only Shanghai Weston's *allegations* to adjudicate the pending motion to dismiss. Further factual development may prove those allegations wrong.

Separately, Tedia's fixation on the allegedly missing elements of a *requirements* contract seems to miss the point. The certificate evidencing the parties' exclusivity arrangement states that the *seller*, Tedia, promises to employ a single Chinese distributor for its chemical solvents, Shanghai Weston. That is not a requirements contract, but rather an exclusive distributorship for the sale of goods. *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F. Supp. 470, 476 n.4 (E.D. Va. 1994) (explaining that the "exclusive distributorship typically provides a distributor with the right to be the exclusive outlet for a manufacturer's products or services in a given geographic area" and "do[es] not … [normally] limit the distributor[] … [but is] frequently coupled with territorial restraints to keep the dealers out of each other's exclusive territories" (citations omitted)). As to such agreements, the exclusivity of the seller's choice in distributor for a given market is clearly a necessary element to enforceability under Ohio law. *CashCan Corp. v. Reinfeld Dev. Ctr., Inc.*, No. 88AP-466, 1989 WL 98441, at \*4–\*5 (Ohio Ct. App. Aug. 24, 1989) (concluding that a modified contractual agreement for the sale of vending machines in which the seller was "not committed" to any particular future sales to plaintiff and was "free to proceed with o[ther] prospects" did not constitute an exclusive dealing agreement). And that is allegedly present here as the seller, Tedia, allegedly appointed Shanghai Weston as the exclusive distributor in China. But beyond that, it is not clear what, if any, other elements are needed to make an exclusive distributorship valid. Certainly, quantity is not one of them. *See Bach v. Friden Calculating Mach. Co.*, 155 F.2d 361, 364–65 (6th Cir. 1946) (explaining that

13

under Ohio law quantity can be inferred from the nature of the arrangement contemplated by the exclusive distributorship contracts). *See also Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 495–96 (S.D.N.Y. 2022) (applying the New York UCC provision that is identical to Ohio Rev. Code § 1302.19(B) to an exclusive distributorship and holding that "the absence of a quantity term in an alleged exclusive distributorship contract … does not make an otherwise valid contract invalid"). Beyond that, the Court's research has not revealed any Ohio case identifying the minimum terms necessary for a valid exclusive distributorship. That said, the Idaho Supreme Court's determination in *General Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1215 (Idaho 1999), provides some helpful thoughts. There, the court said that "duration, geographic scope[,] and performance standards" define the high watermark of material terms.[9] *Id.*; *accord Irwin Indus. Tool Co. v. Worthington Cylinders Wisc., LLC*, 2009 WL 606218, at *18–*19 (W.D.N.C. Mar. 9, 2009) (concluding under Ohio law the hallmark of an exclusive distributorship is whether "one commercial party has the other at its mercy *in a particular market*" (cleaned up)); *but see Miller v. Wikel Mfg. Co.*, 545 N.E.2d 76, 79 (Ohio 1989) (holding that an oral agreement to create an exclusive distributorship in the state of Michigan was valid and enforceable even though the duration was indefinite because by

---

[9] The Court finds *General Auto Parts* generally persuasive because Idaho, another UCC jurisdiction, has enacted the same exclusive dealing provisions that Ohio has. *Compare* Ohio Rev. Code § 1302.19 *with* Idaho Code § 28-2-306. And the Idaho Supreme Court's determination of the material terms of an exclusive distributorship followed its canvassing the relevant caselaw from other jurisdictions. *Gen. Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1215 (Idaho 1999).

operation of law, such contracts are "terminable at will by either party after a reasonable duration and on reasonable notice").

Assuming those are the required terms, the certificate at issue here clearly establishes the duration (the most recent exclusivity agreement was set to expire on December 31, 2023), the geographic region (China), and Shanghai Weston's exclusive control over that market. (Doc. 1-9, #46). And while the performance standards Shanghai Weston had to follow were not expressly dictated in the terms of the certificate, Ohio law, as explored below, imposes an obligation on the distributor "to employ reasonable efforts to generate sales of the product."[10] *Ill. Controls, Inc. v. Langham*, 639 N.E.2d 771, 779 (Ohio 1994). Thus, these terms suffice for the Court to conclude that the Complaint plausibly alleges the existence of a contract that contains all of the material terms necessary to establish an exclusive distributorship.

Simply, contrary to Tedia's contention, the lack of a provision restricting from whom Shanghai Weston could buy chemical solvents, even assuming the full agreement between the parties lacks such a term, does not render the contract unenforceable. *Cf. Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) (holding that under Ohio law, "[a] promise to purchase exclusively from one supplier may be either implicit or explicit" and can be inferred from relevant competent evidence, such as the seller's "awareness of [the buyer's] needs" and the agreement's terms). Rather, the certificate's express provision of the exclusivity (i.e., the limitation

---

[10] As noted above, what reasonable efforts means in the context of the distributorship arrangement between Tedia and Shanghai Weston may be explained and supplemented by parol evidence. Ohio Rev. Code § 1302.05. Put differently, the expected performance standards Shanghai Weston was to follow may be evidenced by the parties' course of dealing.

on which Chinese distributor Tedia could use to sell its chemical solvents), duration, and geographic terms directly map onto the provisos needed for the agreement to constitute a valid exclusive distributorship.

So Tedia's first theory that Shanghai Weston's breach of contract claim premised on the exclusivity agreement must be dismissed because it lacks the necessary material terms—quantity and exclusivity (on Shanghai Weston's part)—fails to persuade.

What about Tedia's alternate theory that exclusivity promise is illusory (i.e., consideration is lacking) because the agreement does not obligate Shanghai Weston to do anything? (Doc. 21, #302–03). For starters, Tedia's argument rests on the same flawed premise rejected above—that the certificate sets out all of the relevant terms of the contract. The plausible existence of other terms beyond those memorialized in the 2018 certificate strongly undercuts Tedia's theory.

But even setting that to the side, the Court would still reject Tedia's argument that the exclusivity agreement lacked consideration. Under Ohio law, "[a] lawful agreement by [] the seller … for exclusive dealing … imposes … an obligation … [on] the buyer *to use best efforts to promote the[] sale* [*of the seller's goods*]." Ohio Rev. Code § 1302.19(B). This statutory enactment implements the rule set forth in *Wood v. Lucy, Lady Duff-Gordon*—a case studied by every law student in first-year contracts. 118 N.E. 214 (N.Y. 1917). Namely, promising a counterparty the exclusive right to represent one's interests is "instinct with an obligation, [even if] imperfectly expressed," of the counterparty to "use reasonable efforts" to promote those interests.

*Id.* at 214; *Ill. Controls*, 639 N.E.2d at 779 ("[W]e hold that a contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product."). And if Shanghai Weston's acceptance of Tedia's promise to use Shanghai Weston as its exclusive Chinese distributor imposes on Shanghai Weston a return obligation to exercise reasonable efforts to promote Tedia's products in China, then there is nothing illusory about the promises contained in the exclusivity agreement.[11] Each party is burdened by a promise to the other that creates a viable cause of action for breach of contract in the event of one party's failure to perform. So Tedia's alternate argument that the breach of the exclusivity agreement claim fails as a matter of law for a want of consideration also lacks merit.

Accordingly, the Court concludes that Count II of the Complaint survives Tedia's motion to dismiss.

---

[11] And this inherent obligation to use best efforts to hawk Tedia's products in China further undermines Tedia's contention that Shanghai Weston need not buy anything that Tedia produces. (*Id.* at #301, 303). If one is obligated to employ best efforts to promote and to sell a product, that obligation likely cannot be satisfied by failing to purchase the seller's goods in the first instance. Put differently, Shanghai Weston would risk being unable to claim it was using best efforts to distribute Tedia's products in China sans buying a non-zero quantity of the chemical solvent. *Ill. Controls*, 639 N.E.2d at 779 ("[A] contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to *generate sales* of the product." (emphasis added)). So although the obligation to buy some solvent is not explicitly stated in the certificate, it reasonably inheres in the obligation to exercise best efforts to create a market for Tedia's product, thereby being integral to the exclusivity agreement. *Cyril Bath Co.*, 892 F.2d at 467. This conclusion is bolstered and can be plausibly inferred from the fact that over the last two decades, Shanghai Weston's alleged outlays to maintain its Chinese distribution network for the sale of Tedia's products were significant. (Doc. 1 ¶¶ 18, 21, #5). In other words, Shanghai Weston operated under the impression that it had to build up Tedia's brand recognition in China by purchasing, marketing, and distributing a non-trivial amount of Tedia's output.

**B.      Count VII – Tortious Interference with the Exclusivity Agreement**

The Court need not tarry long on Tedia's argument why Shanghai Weston's tortious interference claim must be dismissed for failure to state a claim for relief. Tedia's sole argument for dismissal hinges on its mistaken contention that the exclusivity agreement as pleaded does not constitute a valid contract. (Doc. 21, #303; Doc. 25, #426). Tedia is correct that under Ohio law, a tortious interference claim requires proof of "the existence of a contract." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). But given the Court found that Shanghai Weston adequately pleaded the existence of a valid contract, *see supra* Part A, Tedia's sole argument for the dismissal of the tortious interference claim, by necessity, lacks merit. So Count VII of the Complaint likewise survives Tedia's motion to dismiss.

**C.      Count X – Fraud**

Finally, turn to Shanghai Weston's fraud claim. An Ohio fraud claim requires proof of the following elements:

> (1) a representation or, where there is a duty to disclose, a concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that such knowledge can be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

*Captiva, Inc. v. Viz Commc'ns, Inc.*, 85 F. App'x 501, 505 (6th Cir. 2004) (citing *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)). Shanghai Weston appears to be relying on a theory of promissory fraud. (Doc. 1 ¶¶ 139, 142, #22; Doc. 24, #412–13). Namely, Shanghai Weston essentially alleges Tedia "ma[de] a promise concerning a future action [(i.e., the fulfillment of the three purchase orders)] … and,

18

at the time [Tedia] ma[de] [the promise], [it] ha[d] no intention of keeping the promise." *Williams v. Edwards*, 717 N.E.2d 368, 374 (Ohio Ct. App. 1998).

Shanghai Weston's claim fails right out of the gate. To establish fraud, a party must show a misrepresentation *where a duty to disclose* existed. *Levy v. Seiber*, 57 N.E.3d 331, 338 (Ohio Ct. App. 2016). Considering the purchase orders were consummated via arm's-length transactions, (Doc. 1 ¶¶ 42–47, #8–9), the only basis for Tedia's owing Shanghai Weston a duty to disclose would be if "full disclosure [were] necessary to dispel misleading impressions that are or might have been created by [Tedia's] partial revelation of the facts."[12] *Levy*, 57 N.E.3d at 338 (emphasis removed). The Complaint lacks any non-conclusory allegations that Tedia's actions

---

[12] A duty to disclose may also exist if there is a "fiduciary relationship [or] both parties to the transaction understand that a special trust or confidence has been reposed." *Levy*, 57 N.E.3d at 338. No party has argued that either applies here. (Doc. 24, #415; Doc. 25, #427). That tactical choice is wise given the parties are sophisticated businesses that consummated the purchase orders at arm's length. *Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320, 323 (Ohio 1979) (holding that an institutional lender's provision of advice to a debtor did not create a fiduciary or special relationship triggering a duty to disclose because the parties' interactions occurred "in a commercial context in which the parties dealt at arm's length, each protecting his own interest"). And courts applying Ohio law have held, in accordance with the rule adopted by most jurisdictions, that the existence of a distributorship agreement is alone insufficient to give rise to a fiduciary relationship. *E.g.*, *Executone of Columbus, Inc. v. Inter-Tel, Inc.*, No. 2:06-cv-00126, 2007 WL 1144866, at *5 (S.D. Ohio Apr. 16, 2007) (applying Ohio law); *accord OKI Distrib., Inc. v. Amana Refrigeration, Inc.*, 850 F. Supp. 637, 647 (S.D. Ohio 1994) ("[I]t is well established that a manufacturer-distributor relationship, absent more, does not give rise to a fiduciary relationship." (collecting cases from jurisdictions across the country)); *cf. O'Neal v. Burger Chef Sys., Inc.*, 860 F.2d 1341, 1349 & n.4 (6th Cir. 1988) (finding this same rule has been adopted by the vast majority of courts in the context of franchise agreements and collecting cases). So there needs to be additional factual allegations to create a plausible inference that the parties intended their arrangement to have the trappings of a fiduciary relationship or that the parties understood that Shanghai Weston held special trust or confident in Tedia. But, the Complaint is lacking in any such non-conclusory, well-pleaded factual allegations. Without these details, the Court cannot conclude that the exclusive distributorship was anything other than an arm's-length sophisticated economic transaction.

created a mistaken impression about some material fact—let alone, allegations that Tedia even *partially* revealed facts material to the purchase orders. All Tedia is alleged to have done is accepted the three purchase orders and failed to perform on those agreements. (Doc. 1 ¶¶ 43, 45, 47, 50, #8–9; Docs. 1-11, 1-13, 1-15). That is a classic breach of contract claim as alleged. But without more, Shanghai Weston fails to state a claim for relief for fraud because "fraud cannot be predicated upon the mere fact that a promise has been broken." *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235, 243 (Ohio Ct. App. 1995) (cleaned up).

Shanghai Weston counters that Tedia's "confirmations [and subsequent silence about the negotiations involving Tedia and Titan] misled Weston, [thereby] leading Weston to believe that its orders would be fulfilled."[13] (Doc. 24, #413–15). But that argument fails to answer the predicate question whether Tedia had a duty to disclose such information. As Tedia rightly observes, "Shanghai Weston does not point to any partial revelation of facts provided by Tedia [] that were misleading and needed to be dispelled." (Doc. 25, #427). Offering no argument (or specific allegations) to the contrary, Shanghai Weston has failed to plead sufficient factual allegations to make out a claim for fraud. So Count X of the Complaint, Shanghai Weston's fraud claim, must be dismissed without prejudice for failure to state a claim for relief.

---

[13] Shanghai Weston's statement of the fraud claim reinforces that, in actuality, it has simply dressed up its breach of contract claim in fraud garb. As fraud claims turn on duties that exist *independent* of the terms and promises of the contract, *Navistar, Inc. v. Dutchmaid Logistics, Inc.*, 171 N.E.3d 851, 859–60 (Ohio Ct. App. 2021), Shanghai Weston's reliance solely on the promise to deliver the goods contracted for dooms its claim, even beyond the failure adequately to allege that Tedia owed Shanghai Weston a duty to disclose.

20

## CONCLUSION

Altogether, the Court finds that based on the allegations in the Complaint, Shanghai Weston's contract-based claims arising under the exclusivity agreement survives Tedia's motion to dismiss. While further factual developments may vindicate Tedia's position that the exclusivity agreement is not a valid contract, the Court cannot reach that conclusion at this stage of the litigation in light of the well-pleaded factual allegations read in the light most favorable to Shanghai Weston. That said, the Court agrees with Tedia that it owed Shanghai Weston no duty to disclose the potential sale of its business interests to Titan. Therefore, Shanghai Weston's fraud claim fails as a matter of law. So the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Partial Dismissal of Complaint (Doc. 21) under Federal Rule of Civil Procedure 12(b)(6).

Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** only Count X (Fraud) of Plaintiff's Verified Complaint for Injunctive Relief, Declaratory Judgment, and Compensatory and Punitive Damages (Doc. 1). The rest of the Complaint survives dismissal, and the case may continue apace on those remaining claims.

**SO ORDERED.**

December 19, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

21