UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SHANGHAI  WESTON  TRADING
CO., LTD,

        Plaintiff,

                                Case No. 1:23-cv-117

      v.

                                JUDGE DOUGLAS R. COLE

TEDIA COMPANY, LLC,

        Defendant.

## OPINION AND ORDER

Plaintiff Shanghai Weston Trading Co., LTD (Shanghai Weston or Weston) says that Defendant Tedia Company, LLC (Tedia) prematurely ended the parties' longstanding exclusive contract relationship. Tedia says they were never exclusive. The parties' dueling motions for summary judgment task the Court with finding out what actually happened, or at least with deciding whether, and where, genuine disputes exist. (*See* Def.'s Mot. for Partial Summ. J., Doc. 60; Pl.'s Mot. for Partial Summ. J., Doc. 66-1).

Shanghai Weston moves for summary judgment on its claims in Counts I, II, and III of the Amended Complaint (Doc. 53), and also asks the Court to dismiss both of Tedia's counterclaims. (*See generally* Doc. 66-1). Tedia, for its part, moves for summary judgment on eight of the nine claims in Weston's Amended Complaint—all counts except Count II. (Doc. 60, #984). For the reasons below, the Court **GRANTS** (in a limited fashion) Weston's request for summary judgment as to one of Tedia's two counterclaims—the counterclaim for breach of contract—and some elements of its

own claims in Counts I and II, but **DENIES** the rest. (Doc. 66-1). The Court **GRANTS** in part Tedia's request for summary judgment as to Weston's Counts III, IV, V, VI, VII, VIII, and IX, but **DENIES** it as to Count I. (Doc. 60). At bottom, the Court finds a genuine dispute as to a material fact regarding aspects of the Amended Complaint's Counts I and II, so those claims—but only those claims—will move forward.[1]

## BACKGROUND[2]

Defendant Tedia, located in Ohio, manufactures and sells chemical-based solvents internationally. (Pl.'s Proposed Undisputed Facts, Doc. 66-2, #1268; Def.'s Proposed Undisputed Facts, Doc. 60-1, #1024). Tedia began selling its products in China in 1998, partnering from that time forward with Plaintiff Shanghai Weston as its distributor. (Doc. 66-2, #1268; Doc. 60-1, #1024). According to Weston, from 1998 onwards, the parties entered into an exclusive distributorship. (Doc. 66-2, #1268). And Weston claims that it has remained the exclusive distributor of Tedia's products in China ever since. (Doc. 66-1, #1235). Tedia has a vastly different view. It argues

---

[1] Tedia's counterclaim for declaratory judgment remains as well, as it raises the same issues as Counts I and II. (*See* infra Law & Analysis, Part B.1).

[2] In recounting the case's factual background on a motion for summary judgment, the Court relies on the parties' proposed undisputed facts, submitted as part of their briefing as the Court's standing order requires. (*See* Docs. 60-1, 66-2). But here, the parties dispute many facts a given party listed in those filings. (*See* Def.'s Resp. to Pl.'s Undisputed Facts; Doc. 71-1; Pl.'s Resp. to Def.'s Undisputed Facts, Doc. 72-1). As to disputed facts, the Court generally is "required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (first quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); and then citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

that "[t]he parties never entered into a contractual exclusive distributorship."[3] (Def.'s Resp., Doc. 71, #1330). That factual dispute underlies much of this case.

So what does the record evidence show? Starting in 1998, apparently at Shanghai Weston's request, Tedia issued to Weston consecutive "Certificate[s] of Exclusive Distributor Agreement" (Certificate) in 1998, 2000, 2004, 2008, 2009, and 2011, and the relationship continued without issue during that time. (Doc. 66-2, #1269, 1271; *see also* Docs. 64-2–7 (Certificates)). But things started to change in 2011. At that time, a Tedia subsidiary formed a new entity with Anhui Longhua Fine Chemicals Co., Ltd. (Doc. 60-1, #1025). That entity was named Anhui Tedia High Purity Solvents Co., Ltd. (Anhui). (*Id*.). Anhui then began manufacturing Tedia brand products in China. (*Id*.). But the new company also used Shanghai Weston as its distributor for the Chinese market. (*Id*.). And Weston says, consistent with its previous arrangement with Tedia, it was the *exclusive* distributor. (Doc. 72-1, #1429). Indeed, the new venture between Anhui and Tedia "was motivated, at least in part, by Weston's successful marketing and sale of Tedia Products in China." (Doc. 66-2, #1272).

As noted, Anhui began to manufacture Tedia products in China in 2013. (*Id*. at #1273).[4] After Anhui began manufacturing Tedia products in China, though, Tedia issued Weston another Certificate. (*Id*. at #1274). But this time the Certificate listed

---

[3] However, the parties do agree that "Shanghai Weston never agreed to use Tedia as its exclusive supplier of high purity solvents or of any particular product." (Doc. 60-1, #1025).

[4] Before that, in 2012, Tedia had issued Weston another Certificate of Exclusive Distributor Agreement. (Doc. 64-8 (2012 Certificate)).

both Tedia and Anhui as the entities granting distributorship rights. (Doc. 64-9 (2013 Certificate)). And before that Certificate expired, in February 2018, they issued another Certificate, this one set to expire on December 31, 2023. (Doc. 64-10 (2018 Certificate)).

That same February, (and at the same time Tedia issued the Certificate), Mr. Choi (a representative of Tedia) and Mr. Zhou (a representative of Shanghai Weston) met and signed a Letter of Intent (LOI).[5] (Doc. 60-1, #1026; *see also* Doc. 59-3, #908–09 (Letter of Intent)). That letter (like the Certificates) stated that Shanghai Weston "is Tedia's exclusive distributor in China," and explained that the relationship was memorialized by the above-referenced Certificate of Exclusive Distributor Agreement. (Doc. 59-3, #908). The LOI also listed several terms not found in the Certificates, such as: (1) requiring Weston to sell only Tedia-branded products and no other brands; (2) requiring Weston to regularly provide Tedia with sales data regarding Tedia's top four SKUs; (3) listing various products that Tedia can sell through other channels; and (4) requiring the parties to work together to develop marketing strategy. (*Id.*). The LOI ended by stating that the parties would finalize and sign a formal/final agreement with the above terms on or before June 30, 2018. (*Id.*).

But that didn't happen. The parties "were unable to agree on basic terms." (Doc. 60-1, #1027). Indeed, it appears that negotiations had not even progressed far

---

[5] Weston points out that there are two versions of the LOI, (*see* Doc. 29-1; Doc. 59-2, #878 (draft LOI)), but only one version is signed by the parties, (*see* Doc. 29-1, #480).

down that path by the deadline. For example, in lieu of formalizing the agreement by June 30, 2018, as the LOI contemplated, Tedia says it prepared a draft exclusive distributor agreement in June 2018. (*Id.* #1028; *see* Doc. 59-3, #884–902 (draft agreement)). But that proposal was never finalized or signed. (Doc. 60-1, #1029). In fact, Weston says it never even received it. (Doc. 72-1, #1431).

In any event, negotiations around the arrangement contemplated in the LOI continued into 2019. On November 23, 2019, after he met with Mr. and Ms. Zhou (of Shanghai Weston), Mr. Choi (of Tedia) sent Mr. Zhou an email "outlining terms of a '5-year exclusive distributorship'" to begin in early 2020. (Doc. 60-1, #1029). Tedia claims that all three had discussed the proposed contract at the meeting, concluding "with the expectation that Anhui … , Tedia … , and Shanghai Weston would all sign [the forthcoming] written agreement, which was to be drafted by Tedia's Chinese Counsel." (*Id.* at #1029–30).

Weston tells a different story. According to Weston, the parties did not discuss any specific terms at the November 2019 meeting. (Doc. 72-1, #1433). Moreover, Weston says it did not express any expectation or willingness to sign such an agreement, and it did not agree to the terms Tedia proposed. (*Id.*). So when Tedia sent a version of the proposed agreement the next month, Weston ignored it, assuming Tedia had sent it by mistake.[6] (*Id.*). In the end, the parties never signed a "formal" agreement along the lines the LOI contemplated. (Doc. 60-1, #1031).

---

[6] This draft departed enough from the terms contemplated in the signed LOI that Weston considered it to now be a "separate and distinction" negotiation—one with unfair terms to Weston. (Doc. 72, #1398–99 (citing Zhou Supp. Decl., Doc. 69-1, #1305)).

Still, Weston maintains that from 1998 to 2013 (when Anhui entered the scene), and again from 2013 to 2021: (1) there was an exclusivity agreement, and (2) that Weston satisfied its obligations under that agreement by using its best efforts to market and sell Tedia products in China. (Doc. 66-2, #1270–71, 1277). Tedia disputes both assertions. (Doc. 71-1, #1359).

Also noteworthy, despite the LOI contemplating an arrangement under which Weston would sell only Tedia-brand products, Shanghai Weston continued purchasing high purity solvents for distribution or sale in China from other companies. (Doc. 60-1, #1031). The parties dispute, though, whether these other products and companies were "competitors" with Tedia. (*Id.*; Doc. 72-1, #1434).

That brings us to the troubles. In 2021, business started as usual. (Doc. 66-2, #1277). On August 8, 2021, Shanghai Weston issued a purchase order to Tedia. (*Id.*). And the products arrived in Shanghai and were delivered to Weston on April 14, 2022. (*Id.* at #1278). But, despite Weston placing three more orders (the Product Contracts) in the fall of 2021, that was the last product shipment that Weston ever received. (*Id.* at #1278–79). True, Tedia accepted the orders and issued "Order Acknowledgements." (Doc. 60-1, #1031). But in December 2021, before those orders shipped, Tedia's subsidiary sold its ownership interest in Anhui to Shanghai Titan Technology Company Limited (Titan). (Doc. 60-1, #1032). And as part of that sale, "Tedia transferred the ownership of its Chinese trademark 'Tedia' to Anhui." (Doc. 66-2, #1280). Prior to that sale, Titan had been purchasing Tedia Products from Shanghai Weston. (*Id.*).

6

On September 1, 2022, Mr. Hoon, on Tedia's behalf, emailed Weston stating that, after Tedia's sale of Anhui to Titan, "China is under the jurisdiction of Anhui Tedia and all obligations to Weston in that region were transferred as part of the transaction." (*Id.* at #1281 (quoting first Zhou Decl, Doc. 64-1, #1168; and then citing Doc. 64-20, #1202 (emails))). In other words, Tedia was instructing Weston that Weston would have no further dealing with Tedia itself. Rather, it now must buy all products through Anhui (now owned by Titan). (*Id.*).

Shanghai Weston claims that this September 2022 email was the first they heard of this change to the relationship. (*Id.* at #1282). But Tedia claims that nearly a year earlier, in December 2021, Mr. Choi had a discussion with Mr. Zhou, explaining the new arrangement—Tedia would make its products available to Weston through 2023, but the sales would go through Anhui. (Doc. 60-1, #1032–33). And Tedia claims that when advised of that proposal, Mr. Zhou did not object. (*Id.* at #1033).

Then, on December 19, 2022, over a year after Shanghai Weston had placed its three acknowledged-but-as-yet-unfilled orders, Tedia emailed Weston updating them on the status of those shipments. (Doc. 66-2, #1283). Tedia stated that the first shipment was on the way, and the other two orders would ship shortly. (*Id.*). But that email instructed Weston to work with Anhui (which Titan had now owned for over a year) to develop new prices for these products and directed Weston to submit a new purchase order for those products to Anhui. (*Id.* at #1283–84). In other words, Tedia was now shipping (and selling) those products to Anhui, and Weston would need to

purchase them from Anhui to receive them. (*Id.* at #1284). Presumably, from Tedia's perspective, this was consistent with the facts that (1) it had sold Anhui to Titan in December 2021, and that (2) on December 31, 2021, Anhui had appointed Titan as its distributor for Tedia products. (*See id.* at #1284–88). Indeed, since January 1, 2022, Anhui and Titan "have been marketing, selling, and/or distributing Tedia products in China." (*Id.* at #1285). Unhappy with this new arrangement, Weston ceased ordering products from Tedia, claiming that it would have been "futile." (*Id.*).

To recap, Shanghai Weston claims that, by contract, it was Tedia's exclusive distributor and that arrangement was set to last until at least 2023. But by the end of 2021, Tedia's actions caused Weston to no longer in fact be its exclusive distributor, in turn substantially damaging Weston's business. (*Id.* at #1286). Tedia, by contrast, claims that there never was an exclusive distributorship and anyhow, that it "remained willing to and wanted to make its products available for purchase by Shanghai Weston in 2022 and 2023 and would have fulfilled orders placed by Shanghai Weston by shipping the ordered products to Anhui for resale to Shanghai Weston." (Doc. 60-1, #1033).

Based on these allegations, Shanghai Weston sued on February 27, 2023. (Compl, Doc. 1). That original Complaint raised eleven claims. (*See id.* at #14–25). Tedia moved to dismiss only three of these claims—breach of contract, tortious interference with a business contract, and fraud. (Doc. 21). The Court denied Tedia's motion as to the breach of contract and tortious interference claims, but dismissed the fraud claim without prejudice. (Op. & Order, Doc. 26, #450).

8

Shortly after the Court's earlier Opinion and Order, Tedia answered. (Doc. 29). There, it included counterclaims for declaratory judgment and breach of contract. (*Id.* at #472–74). Later, Shanghai Weston timely filed a Motion for Leave to File Amended Complaint *Instanter*, attaching the Amended Complaint, (Docs. 39, 39-1), which the Court granted, (Doc. 52).

The Amended Complaint asserts nine claims: (1) breach of the exclusivity agreement (Count I); (2) breach of the product contracts (Count II); (3) promissory estoppel arising out of the exclusivity agreement (Count III); (4) promissory estoppel arising out of the purchase orders (Count IV); (5) unjust enrichment (Count V); (6) Tedia's tortious interference with the exclusivity agreement as it pertained to Anhui (Count VI); (7) Tedia's tortious interference with Shanghai Weston's business relationship with Anhui (Count VII); (8) conversion (Count VIII); and (9) civil conspiracy (Count IX). (Doc. 53, #751–57)

Discovery continued, and seven more months passed before the parties filed the present motions: dueling motions for summary judgment. (*See* Docs. 60, 62).[7]

Plaintiff Shanghai Weston now seeks summary judgment on its claims for breach of the exclusivity agreement (Count I), breach of the three product contracts (Count II), and promissory estoppel on the exclusivity agreement (Count III). (Doc. 66-1, #1228). It also seeks summary judgment dismissing both of Tedia's

---

[7] Two weeks later the Court granted Shanghai Weston leave to file a Corrective Motion for Partial Summary Judgment. (*See* 8/28/25 Min. Entry and Not. Order; Docs. 66, 66-1).

counterclaims: declaratory judgment (Count I) and breach of contract (Count II). (*Id.*).

Tedia responded, (Doc. 71), and Weston replied, (Doc. 76). So that motion is ripe.

Defendant Tedia Company, LLC seeks summary judgment on Counts I, III, IV, V, VI, VII, VIII, and IX, or in other words, on all of Weston's claims except breach of the products contracts (Count II). (Doc. 60, #984). Weston responded, (Doc. 72), and Tedia replied, (Doc. 75). So that motion is ripe as well.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324–25; *Lansing Dairy*, 39 F.3d at 1347. A party must support any assertions with evidence such as depositions, documents, affidavits, or other admissible evidence (or at the very least citing material that could "be presented in a form that would be admissible in evidence"). Fed. R. Civ. P. 56(c)(1), (2). If there is "a complete failure of proof concerning an essential element of the nonmoving party's case," then the Court will treat "all other facts [as] immaterial." *Celotex*, 477 U.S. at 323. And the nonmoving party cannot defeat summary judgment merely by pointing to *any* factual dispute. Indeed, "the mere existence of some alleged

10

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). That is, the dispute must be both "genuine" (i.e., supported by evidence) and go to a "material fact" (i.e., a fact that could change the outcome).

Essentially, the appropriateness of summary judgment turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). And in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

When both parties move for summary judgment, that does not change the analysis the Court applies to each party's motion. Rather, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Black v. Pension Benefit Guar. Corp.*, 973 F.3d 576, 581 (6th Cir. 2020) (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) (quotation marks omitted)), *superseded on other grounds*, 983 F.3d 858 (6th Cir. 2020). "The fact that both parties have moved for summary judgment does not mean that the court

11

must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## LAW AND ANALYSIS

**A.  The Court Denies Summary Judgment as to Counts I & II Because There Remain Genuine Disputes, But the Court Grants Tedia Summary Judgment on Counts III, IV, V, VI, VII, VIII, and IX.**

Much of this case turns on whether the parties were bound by a valid exclusive distributorship. But the record reflects a genuine dispute on that issue. While the Court finds that an exclusive relationship began in 1998, there is an issue of fact regarding whether that agreement was renewed in its most recent iteration. And while there is no dispute that Shanghai Weston's purchase orders formed binding contracts (Count II), there is a genuine dispute over whether Weston waived the violated terms. So neither party is entitled to summary judgment on those claims. But as to the rest, Tedia succeeds as a matter of law.

**1.  Count I: The Court Denies both Parties' Motions for Summary Judgment Because a Genuine Dispute Exists as to Whether the 2018 Extension of the Distributorship was Conditional on the Signing of a Formal Agreement.**

Shanghai Weston claims it had the right to serve as the exclusive distributor of Tedia-brand products in China through December 31, 2023. (*See* Doc. 26, #442). But by the end of 2021, Tedia allegedly deprived Weston of that right. So Weston says Tedia breached. Under Ohio law, there are four elements to a breach of contract claim: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by

the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V &*
*M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citations omitted).
The Court discusses each below.

### a. There Is a genuine dispute as to whether a contract exists.

The question at the heart of this case is whether the parties were bound by an
"Exclusive Distributor Agreement" from 2018 to 2023. Generally, whether a contract
exists is a question of fact. *First Star Logistics, LLC v. Bernard*, No. 1:16-cv-1070,
2020 WL 7698130, at *7 (S.D. Ohio Dec. 28, 2020). Yet both Weston and Tedia claim
that the undisputed facts support their side of the story, and so each move for
summary judgment on that issue. (Doc. 60, #1002; Doc. 66-1, #1254, 1256–57). The
Court disagrees with both. While the record facts largely support Weston on this
issue, there nonetheless remains at least one genuine dispute of material fact—
whether the exclusive distributorship's renewal in 2018 was conditional on the
parties signing a formal agreement.

"The '[e]ssential elements of a contract include an offer, acceptance,
consideration, [and] a manifestation of mutual assent. A meeting of the minds as to
the essential terms of the contract is a requirement to enforcing the contract.'" *Buzz
Seating, Inc. v. DCI, Inc.*, No. 1:24-cv-555, 2025 WL 1191026, at *4 (S.D. Ohio Apr.
24, 2025) (quoting *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2022)) (cleaned up).
And because Weston is the party claiming an exclusive distributorship exists, he

bears the burden of showing the existence of the minimum terms needed to make such an agreement valid.[8] *See* Ohio Rev. Code § 1302.19(B).

The Court finds that Weston carries that burden. Despite the lack of a formal agreement signed by both parties at the time, Weston successfully establishes that it entered an exclusive distributorship with Tedia in 1998. Specifically, the parties' long course of conduct, combined with the nine "Certificate[s] of Exclusive Distributor Agreement," make that the only reasonable conclusion on the facts here. (Doc. 66-2, #1269–75; *see* Docs. 64-2–10 (Certificates)).

To expand on that a bit, from 1998 onward, which is when Tedia first introduced its products in China, Weston has been the sole distributor of Tedia products in the China market.[9] (Doc. 66-2, #1268, 1270; Doc. 71-1, #1346). And throughout the years, Weston invested "substantial money, resources, and efforts

---

[8] As the Court discussed in its previous order, it is not altogether clear what the "essential terms" are under Ohio law to make an exclusive distributorship valid. (opinion cite). One, of course, is that the seller must be bound to use that distributor in a given market. *CashCan Corp. v. Reinfeld Dev. Ctr., Inc.*, No. 88AP-466, 1989 WL 98441, at *4–5 (Ohio Ct. App. Aug. 24, 1989). And quantity is *not* one such element. *See Bach v. Friden Calculating Mach. Co.*, 155 F.2d 361, 364–65 (6th Cir. 1946) (explaining that under Ohio law quantity can be inferred from the nature of the arrangement contemplated by the exclusive distributorship contracts); *see also Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 495–96 (S.D.N.Y. 2022) (applying the New York UCC provision that is identical to Ohio Rev. Code § 1302.19(B) to an exclusive distributorship and holding that "the absence of a quantity term in an alleged exclusive distributorship contract … does not make an otherwise valid contract invalid"). Case law from other jurisdictions suggests that "duration, geographic scope[,] and performance standards" define the high watermark of material terms. *Gen. Auto Parts Co. v. Genuine Parts Co.*, 979 P.2d 1207, 1215 (Idaho 1999) (collecting cases); *accord Irwin Indus. Tool Co. v. Worthington Cylinders Wis., LLC*, No. 3:08-cv-291, 2009 WL 606218, at *18–*19 (W.D.N.C. Mar. 9, 2009) (concluding under Ohio law the hallmark of an exclusive distributorship is whether "one commercial party has the other at its mercy *in a particular market*" (cleaned up) (emphasis in original)).

[9] Outside of some small quantities of products sold to customers and markets that Weston did not serve. (*See* Doc. 71-1, #1346).

into … the marketing and sale of Tedia Products, the building of distribution systems for Tedia Products, and building and promoting [the] Tedia brand throughout China." (Doc. 66-2, #1269). So the parties certainly *behaved* as if an exclusive distributorship existed. That alone "lead[s] to a reasonable assumption that a contract exists between the parties by tacit understanding." *Hannibal Dev., LLC v. Lackawanna Transp. Co.*, No. 2:18-cv-1265, 2020 WL 4607672, at *7 (S.D. Ohio Aug. 11, 2020) (quoting *Percio v. Smith*, 2014-Ohio-1266, ¶ 15 (2d Dist.) (explaining that parties may prove contracts as either express or implied-in-fact).

If that were not enough, Shanghai Weston also points to more explicit evidence of the alleged exclusivity agreement. Beginning in 1998, Tedia issued nine "Certificate[s] of Exclusive Distributor Agreement." (Doc. 66-2, #1269–75; *see* Docs. 64-2–10). Tedia signed each Certificate. (*See* Docs. 64-2–10). Importantly, while admittedly barebones, those Certificates each contained the essential terms of an exclusive distributorship: geographic scope (China), duration (an expiration date in the future), and an exclusivity commitment. (*Id.*); *see Gen. Auto Parts Co.*, 979 P.2d at 1215. And how the parties went about issuing the new Certificates also sounds a lot like a "meeting of the minds." (*See* Doc. 60-1, #1026). Every few years when the previous Certificate was set to expire, Weston contacted Tedia to request the arrangement continue (offer), and Tedia issued a new signed Certificate (acceptance). (*Id.*). Indeed, the very fact that these Certificates each had a date for which they were set to expire suggests that the parties believed they carried some legal force.

Finally, while Tedia does not contest consideration, the Court notes that while the Certificates did not impose any particular obligations on Weston, Ohio law does. That is because, under Ohio law, an exclusive dealer contract "imposes … an obligation … [on] the buyer *to use best efforts to promote the[] sale* [*of the seller's goods*]." Ohio Rev. Code § 1302.19(B) (emphasis added). So, on the surface at least, Shanghai Weston has established an exclusive distributorship between the parties.

That said, even if the parties entered an exclusive agreement in 1998, that agreement needs to have remained in force during the time the alleged breach occurred. And Tedia successfully creates a genuine dispute as to whether that was the case here. That dispute is over whether the parties made the 2018 Certificate's renewal of the exclusive distributorship contingent upon the signing of a formal agreement by the deadline set out in the LOI. (*See* Doc. 59-3, #908–09). That is material because this case concerns conduct that occurred in 2021, 2022, and 2023. Whether an exclusivity agreement existed during that time depends on whether the 2018 Certificate is valid, as that is the certificate that purported to extend the parties' agreement to December 31, 2023. (*See* Doc. 64-10, #1181 (2018 Certificate)). And here, the "evidence presents a sufficient disagreement to require submission [of that dispute] to a jury." *Amway Distribs. Benefits Ass'n*, 323 F.3d at 390 (quoting *Anderson*, 477 U.S. at 251–52).

Start with the facts on Tedia's side. The LOI and 2018 Certificate, both purporting to govern the exclusive distributorship, were signed together on the same day. (Doc. 60-1, #1026–27). So, Tedia says, the two are linked, meaning that Tedia

16

believed at the time that "it was clear that the distributorship would not be extended to 2023 until the [formal] agreement and terms were signed." (Doc. 60, #1005 (quoting Doc. 60-1, #1029)). Tedia further points to some correspondence between the parties on that front that supports its view. (*See, e.g.*, Doc. 59-3, #903 ("Martin [Zhou] called [name] yesterday: the brief agreement … will expire on June 30 … he is concerned that his business will be impacted.")). For example one email from Mr. Choi to Mr. Zhou summarizing their November 2019 meeting about a formal agreement includes that the contemplated agreement would "award Weston with the 5-year exclusive distributorship beginning January 1, 2020." (Doc. 59-4, #912). That is odd phrasing to use if an exclusive distributorship already bound the parties until 2023. In addition, on December 31, 2019, after efforts to negotiate a formal agreement largely failed, Tedia sent Weston a new "Certificate of Distributor Agreement"—this time set to expire at the end *of 2020*. (Doc. 59-7, #941–42 (2020 Certificate)). If the parties had intended the 2018 Certificate to be valid and in force until 2023, then this later-issued one-year renewal makes little sense.

But Shanghai Weston views the facts differently. It argues that the potential agreement contemplated by the signed LOI was separate and distinct from the exclusive distributorship the Certificates created, and offers its own evidence to that effect. (Doc. 72, #1393). Most notably, Mr. Zhou avers that when he and Mr. Choi met in 2018 to renew the exclusive distributorship, he explicitly declined to make the 2018 Certificate contingent upon the signing of a formal agreement. (Doc. 69-1, #1302–03). In fact, Mr. Choi presented the Draft LOI with a clause detailing that if the parties

17

could not agree on terms "before June 30, 2018 the 5-year Certificate of Exclusive Distributor Agreement (for years 2019-2023) will be immediately terminated and only the current agreement which expires December 31, 2018 will be in effect." (*Id.*; Doc. 59-2, #878–79 (Draft LOI)). But Mr. Zhou refused to sign the LOI on behalf of Weston until that provision was deleted. (Doc. 69-1, #1303). And so, the signed LOI did not contain the term. (*See* Doc. 59-3, #908). Because both parties point to significant probative evidence regarding this dispute, it should be submitted to the jury.

Tedia tries to avoid that result by characterizing the LOI's role a little differently. The way Tedia tells it, the agreement contemplated by the LOI *is* the exclusive distributor agreement, and because it was never finalized, there is no contract—Certificates notwithstanding. (Doc. 60, #1006); *Gen. Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669, 676 (6th Cir. 1952) ("As long as both parties contemplate that something remains to be done to establish [the] contractual relationship, no contract has been made."). The Court disagrees.

The Court sees what tempts Tedia to advance this argument—the unagreed to, unsigned draft agreement to which Tedia points looks a lot like the sort of contract that two sophisticated parties would sign (especially when compared to the barebones Certificates). (*See* Doc. 59-3, #884–902 (draft formal agreement)). So there is some logic to the idea that if two companies were agreeing to create an exclusive distributorship, it would look like that proposed formal agreement. On the other hand, Weston had been acting as Tedia's exclusive distributor since 1998, apparently

18

without such an expansive agreement, and that relationship was reflected only in the successively issued Certificates.

Moreover, despite Tedia's contention to the contrary, the LOI, and the parties' negotiations around the unsigned formal agreement, do not foreclose the possibility that the parties already had a pre-existing exclusive distributorship arrangement— an agreement that they renewed through the 2018 Certificate. The Court can think of any number of reasons why parties who have an existing contractual relationship might nonetheless seek to renegotiate or better define the terms of that relationship. In fact, the LOI itself provides at least one additional term that likely motivated Tedia to pursue the formal agreement it describes—the promise that "Weston w[ould] sell only Tedia brand and no other brands." (Doc. 59-3, #908).

Yet even though the Court does not buy the claim that the LOI disproves the existence of the exclusive distributorship writ large, it is certainly at least possible that the parties' 2018 *renewal* of that distributorship agreement was indeed contingent on the signing of a final, formal agreement by the LOI's required date. (Doc. 60-1, #1026–27). And because the material facts surrounding that issue remain in dispute, and because the Court must read the facts in favor of the opposing party as to both summary judgment motions, *Black*, 973 F.3d at 581, the Court denies both.

### b. Tedia fails to show that Weston breached first.

Tedia next claims that, even assuming there is an enforceable exclusive distributor agreement, Shanghai Weston breached it first, relieving Tedia of any potential liability. *First Energy Sols. v. Gene B. Glick Co.*, 2007-Ohio-7044, ¶ 35 (9th

19

Dist.) (citations omitted) ("It is well established that a material breach by one party relieves the other of its obligation to perform under a contract."). Specifically, Tedia argues that Shanghai Weston breached the exclusive distributorship by purchasing and re-selling in China some number of high purity solvents not manufactured by Tedia or Anhui.[10] (Doc. 60, #1007; Doc. 60-1, #1026, 1031).

That argument fails to persuade. Remember, the existence of a contract is supported by the various Certificates and the parties' course of conduct over the years. Nothing in either of those suggests that Weston agreed to distribute exclusively for Tedia. Nor does the law require the exclusivity obligation to run in both directions. An exclusive distributorship means that the manufacturer exclusively uses one distributor; it does not necessarily mean that the distributor likewise only represents one manufacturer. *See, e.g.*, *Erickson's Flooring & Supply, Co. v. Tembec, Inc.*, No. 03-74214, 2006 WL 148759, at *3 (E.D. Mich. Jan. 18, 2006) (dismissing argument that the"[p]laintiff's alleged distribution of products for two of [the d]efendant's competitors shows that [p]laintiff was not bound by an exclusivity agreement" because mutuality of obligation did not require mutual exclusivity), *aff'd*, 212 F. App'x 558 (6th Cir. 2007). Sure, the signed LOI (and unsigned draft agreement) contemplated an arrangement under which "Weston will sell only Tedia brand and no other brands." (Doc. 59-3, #908). But, as discussed above, assuming that the Certificate itself created (or at least reflected) an earlier

---

[10] The parties dispute whether these companies and products were "competitors" to Tedia. (Doc. 60-1, #1031; Doc. 72-1, #1434).

20

contractual arrangement, that earlier contract perforce would be separate and distinct from the formal agreement the LOI contemplates. Indeed, as also discussed, the fact that Weston apparently had the ability to sell other brands under the Certificate agreement and had been doing so for some time might have been what motivated Tedia to attempt to negotiate a new formal agreement. So the Court rules in Shanghai Weston's favor on the Weston-breached-first issue.

### c. If an exclusive distributorship exists, Tedia has breached it.

In order to succeed on its breach of contract claim, Weston must, of course, also establish that Tedia breached the contract. *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 933 F. Supp. 2d 974, 994 (S.D. Ohio 2013). Based on the facts in the record, the Court finds that Weston has done so. "A party breaches a contract if he fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citation omitted) (discussing Ohio law).

The terms at issue here are relatively straightforward. The 2018 Certificate granted Weston the right to be the exclusive distributor of Tedia products in China, which included the exclusive right to purchase those products from Tedia. (Doc. 59-3, #910). And Weston says Tedia failed to meet that obligation.

Weston primarily cites two facts in support. First, on September 1, 2022, Tedia informed Weston by email that going forward it would need to work with Anhui and Titan to buy the products produced by Tedia, and that its obligations to Weston were transferred to Anhui/Titan as part of Anhui's sale to Titan. (Doc. 66-2, #1281). Or in

21

other words, Tedia would sell and send products to Anhui, and Weston in turn must buy them from Anhui. (*Id*.). That included Weston needing to issue new purchase orders through Anhui for the three Product Contracts already pending with Tedia. (*Id*. at #1283–84). Second, Weston points to evidence that, on December 31, 2021, Anhui appointed Titan to be an authorized distributor for its Tedia products in China. (*See* Doc. 64-1, #1171; Doc. 64-22, #1207–08 (Distribution Authorization Letter)). That is sufficient to show breach. Assuming that Tedia had an exclusive distributorship arrangement with Weston at the time, Tedia violated it in two ways— by appointing a new distributor, and by selling products to a company other than Shanghai Weston in China.

Sure, Weston concedes that "Tedia did not ship any product to Anhui or any other entity in China in 2022 or 2023 other than the three shipments earmarked for Shanghai Weston to fulfill the 2021 Purchase Order." (Doc. 60-1, #1033). So in at least one sense, Weston didn't lose its "exclusive" rights—no one else was selling Tedia products in China through 2023. But a contract for exclusive dealing requires more from the manufacturer than that—Tedia must also "supply the goods" to Weston. Ohio Rev. Code § 1302.19(B) (stating that a contract for exclusive dealing includes an "obligation by the seller to use best efforts to supply the goods"). Weston has established a breach of the exclusivity agreement.

22

### d.    There is a genuine dispute about damages.

Finally, Shanghai Weston must prove damages. Its damages theory is simple; Weston lost millions in sales as a result of no longer selling Tedia products in China. (Doc. 66-1, #1260).

"The sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach[.]" *Princeton Radiology Assocs., PA v. Advoc. Radiology Billing & Reimbursement Specialists, LLC*, No. 2:19-cv-2311, 2022 WL 501205, at *2 (S.D. Ohio Jan. 3, 2022) (quoting *DeCastro v. Wellston City Sch. Dist. Bd. of Educ.*, 761 N.E.2d 612, 616–17 (Ohio 2002)). Weston seeks the lost profits that it says Tedia's breach caused. (Doc. 66-1, #1260).

But that damages theory has a hiccup. Tedia says it was happy to provide Weston with Tedia products for resale for the remainder of the distributorship, just with Anhui acting as the middleman. (Doc. 60-1, #1033). And Anhui agreed not to mark up the purchase price to Shanghai Weston, only adding "the cost of customs clearance fees, freight costs, and other import and overhead costs that Shanghai Weston would otherwise have incurred itself to import the products directly from Tedia." (*Id.* at #1032). So, Tedia says, Weston only lost profits because of its own unwillingness to work in that modified arrangement. (Doc. 60, #1010). Weston disputes this, pointing to testimony that Tedia's shipment of products to Anhui did not fulfill the terms of the 2021 Purchase Orders because they were sent to Anhui (instead of Weston) and sent well after the delivery date. (Doc. 72-1, #1436 (citing Doc. 69-1, #1308)).

This dispute—whether Weston could have continued to make its normal volume of sales by working through Anhui—is material.[11] And so, the Court cannot determine as a matter of law whether Weston was harmed by Tedia's breach. Accordingly, neither party is entitled to summary judgment on this element.

In sum, the Court finds that there is a genuine dispute as to a material fact regarding both the existence of the contract itself, and Weston's claimed damages. But the Court finds that there is no dispute over whether, assuming there was a contract, Tedia breached the contract and as to whether Weston did so first, ruling in Weston's favor on both.

> **2.      Count II: The Court Denies Shanghai Weston's Motion for Summary Judgment on Its Breach of the Product Contracts Claim Because There Remains a Genuine Dispute.**

Shanghai Weston brings a second breach of contract claim based on Tedia breaching the three Product Contracts. (Doc. 66-1, #1260). While Weston moves for summary judgment on this claim, Tedia does not. Tedia instead argues that questions of fact preclude judgment for Weston at this stage. (Doc. 71, #1339). Once again, "[u]nder Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel*, 678 F.3d at 465 (citations omitted). Here, though, Tedia contests only the third element—

---

[11] While Weston was conceivably harmed in other ways by the breach of the exclusive distributorship—e.g., lost reputation and ability to make sales, loss of bargaining position towards Tedia, delay in receiving shipments, or, of course, increased competition—it fails to point to any record evidence of one of these alternate theories.

breach. (Doc. 71, #1339–41). Specifically, Tedia argues that there is "an issue of fact as to whether Weston waived strict compliance with the terms of the Product Contracts." (*Id.* at #1340).

Tedia's focus on the breach element makes sense. There clearly is a contract here (well, three contracts). Weston submitted three purchase orders, and Tedia issued three order acknowledgments. (Doc. 66-2, #1278–79; *see also* Docs. 64-14–19 (purchase orders and order acknowledgments)). That makes a contract. *Material Scis. Corp. v. Am. Roll Formed Prods. Corp.*, No. 1:19-cv-1738, 2020 WL 821488, at *2 (N.D. Ohio Feb. 18, 2020) ("[W]here parties engage in a general practice of using the same procedure when placing and accepting orders, such conduct constitutes a valid acceptance and creates a binding contract between the parties."). Indeed, Tedia concedes that the "2021 Purchase Orders and the corresponding Order Acknowledgments were valid contracts for the sale of goods." (Doc. 60, #1014). And Tedia breached those contracts as written because it admits it did not deliver the orders "in accordance with the terms set forth in the Product Contract (*e.g.*, by the stated promised ship date or to the 'ship to' address)." (Doc. 66-2, #1279; Doc. 71-1, #1363).

But that does not end the inquiry. Under Ohio law, "subsequent acts and agreements may modify or operate as a waiver of commercial sales contract terms."[12]

---

[12] Even though Ohio courts sometimes use the words waiver and modification interchangeably, they are distinct legal concepts. *BR Kettering Towne Ctr. LLC v. Golden City Ballroom LLC*, 2016-Ohio-5159, ¶ 44 (Ohio Ct. App. 2016) ("The modification of a contractual term is distinct from the waiver of a contractual term. A modification to a contractual provision is an agreement by the parties to change or modify the term in

25

*Paramount Supply Co. v. Sherlin Corp.*, 475 N.E.2d 197, 206 (Ohio Ct. App. 1984) (discussing Ohio Rev. Code § 1302.12) (citation omitted); *see Hagglunds Denison Corp. v. Hydraulics Int'l, Inc.*, No. 92AP-478, 1992 WL 308601, at \*2 (Ohio Ct. App. Oct. 20, 1992) (reversing summary judgment for plaintiff because whether the parties modified or waived the agreement was a question of material fact). And the Court finds that there is a genuine dispute over whether Weston waived the relevant terms.

Turn to the first allegedly violated term: the delivery address. Tedia claims that on December 6, 2021, "Mr. Choi explicitly told Mr. Zhou that Tedia would continue to make products available to Weston through 2023, but that the sales would go through Anhui … [and] Mr. Zhou did not object." (Doc. 71, #1340 (citing Choi Decl, Doc. 59-1, #869–70)). Or, in other words, Weston agreed to the new arrangement in which Tedia would deliver products for Weston to Anhui for later shipment to Weston. But Weston points to testimony from Mr. Zhou disputing that characterization of the call. (Doc. 72-1, #1436 (citing Doc. 69-1, #1307 (Mr. Zhou discussing the December 6, 2021, call and testifying that Mr. Choi notified him of the sale to Titan, but stated that all purchase orders would be honored through 2023, with the products shipped directly to Weston))). So there is a genuine dispute.

That said, Tedia also failed to ship the ordered products by the shipment dates promised in the contracts. (Doc. 66-2, #1283). But Tedia claims Weston waived compliance with that term as well. (Doc. 71, #1340–41). It bases that waiver

---

question … [i]n contrast, waiver is "a voluntary relinquishment of a known right." (citations omitted)); *See also* Ohio Rev. Code § 1302.12 ("Although an attempt at modification or recission does not satisfy the requirements … it can operate as a waiver."). The Court finds a material dispute as to a potential waiver by Weston, not a modification.

26

argument on Mr. Zhou (from Weston) continuing to inquire over the course of a month regarding the status of the Product Contracts even though Tedia had not yet shipped the product by the promised date. (*Id.* (citing Doc. 65-1, #1215–19 (email chain between Mr. Zhou and a Tedia representative)). More importantly, during that discussion with Tedia, Mr. Zhou allegedly requested a new shipping schedule. (Doc. 65-1, #1217–18 ("WES-21-9USA can be shipped out soonest … I expect 4 weeks apart for each shipment.")). Reading those facts in the light most favorable to Tedia (the non-moving party) suggests that a genuine dispute remains about whether Weston waived compliance with the shipping date term.

In sum, the Court finds that, based on this evidence, a reasonable juror could find that Weston waived the relevant terms of the contract, and so a dispute of material fact precludes summary judgment for Weston at this stage.

### 3. Counts III & IV: The Court Grants Tedia Summary Judgment on Weston's Promissory Estoppel Claims.

Both parties move for summary judgment on Weston's first promissory estoppel claim, and Tedia requests it for the second claim as well. (Doc. 60, #1011–14; Doc. 66-1, #1262–63). The Court sides with Tedia on both counts.

In Ohio, promissory estoppel can be an alternate theory of recovery, but "the existence of a valid and enforceable contract 'generally' precludes a claim of promissory estoppel arising from claims related to the contract." *Schaumleffel v. Muskingum Univ.*, No. 2:17-cv-463, 2018 WL 1173043, at \*18 (S.D. Ohio Mar. 6, 2018) (citation omitted). So Ohio courts "permit promissory estoppel claims to be pleaded alternatively to breach of contract claims, although damages cannot be awarded for

the same wrong under both claims." *Id.* (citation omitted). "To properly state a claim for promissory estoppel, a plaintiff must prove (1) the existence of a clear and unambiguous promise, (2) that was relied upon by the party to whom the promise was made, (3) where such reliance was reasonable and foreseeable, and (4) where there was an injury resulting from the reliance." *Haas v. TruPartner Credit Union, Inc.*, No. 1:22-cv-678, 2024 WL 3925724, at *4 (S.D. Ohio Aug. 22, 2024) (citing *O.E. Meyer Co. v. BOC Group*, No. E-99-002, 2000 WL 234549, at *17 (Ohio Ct. App. Mar. 3, 2000)).

Weston's Count III is based on the "promise" included in the various Certificates Tedia signed: that Weston had the exclusive right to "sell, accept, and process orders for and distribute the Tedia reagent and laboratory chemicals in China." (Doc. 66-1, #1262 (citing Doc. 64-1, #1159)). "In reliance upon that promise, Weston established more than 3,000 distribution outlets, recruited customers, stocked and maintained Tedia inventory, leased facilities for the storage of Tedia Products, and hir[ed] personnel." (*Id.* at #1262–63; Doc. 66-2, #1269–70).

The Court grants summary judgment to Tedia for a simple reason: as discussed above, either the 2018 Certificate constituted a contract (making a promissory estoppel claim impermissible) or that Certificate was revoked because the parties did not come to a formal agreement—meaning there was no promise on which to rely.

Count IV is the same. Tedia concedes that the Products Contracts are valid contracts. (Doc. 60, #1014). So Weston cannot bring a promissory estoppel claim based on the promises they contain.

28

4.      **Count V: The Court Grants Tedia Summary Judgment on Weston's Unjust Enrichment Claim.**

Tedia moves for summary judgment on Weston's unjust enrichment claim. The Court agrees with Tedia here, as well. Under Ohio law, the elements of a claim for unjust enrichment are "(1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment." *Grassi v. Grassi*, No. 20-3358, 2021 WL 3355475, at *5 (6th Cir. Aug. 3, 2021) (emphasis added) (citations omitted). "[T]he third element is critical." *Id.* The "plaintiff must show 'enrichment that is unjust'— that under the circumstances, the plaintiff has a 'superior equity' that makes it 'unconscionable for the … [defendant] to retain the benefit.'" *Id.* (quoting *Andersons, Inc. v. Consol., Inc.*, 348 F.3d 496, 502 (6th Cir. 2003)).

Weston fails to point to any evidence in support of that third element—that Tedia is "unconscionably" retaining a benefit. Sure, Weston expended efforts to sell Tedia products over the years, and Tedia received money from those sales, *but so did Weston.* (Doc. 60-1, #1025 ("Shanghai Weston profited from the sale of Tedia products in China.")). Weston points to no facts suggesting that it has expended efforts since Tedia terminated the exclusive distributorship for which Weston remains uncompensated. Nor does Weston even point to facts supporting that Tedia is now unjustly profiting off the market that Weston built for Tedia products in China. In fact, Tedia did not ship any products to China during the remainder of 2022 and 2023,

29

other than the three shipments it sent to fulfill Weston's purchase orders. (*Id.* at #1033).

### 5. Counts VI & VII: The Court Grants Tedia Summary Judgment on Shanghai Weston's Tortious Interference Claims.

The Court also grants Tedia summary judgment on Weston's tortious interference claims. That is because "only a stranger, a party not mentioned in the contract, may be liable for tortious interference." *O'Neil v. Tech. Loss Adjustment & Appraisal, LLC*, No. 1:08-cv-510, 2009 WL 10688198, at *3 (N.D. Ohio Mar. 30, 2009). Tedia, of course, is a party to the exclusive distributorship, the contract with which Weston claims it interfered. (Doc. 53, #754).

Weston attempts to evade this result by claiming that Tedia interfered with its separate agreement (and business relationship) with Anhui. (Doc. 72, #1423). That is futile. Weston puts forward no facts of a separate agreement with Anhui, and insomuch as Anhui was a party to the distributorship, it was jointly so with Tedia. (Doc. 66-2, #1274 ("Tedia and Anhui jointly issued [the 2013] Certificate of Exclusive Distributor Agreement.")). Shanghai Weston cannot repackage its breach of contract claim as a tort claim. The Court grants summary judgment.

### 6. Count VIII: The Court Grants Tedia Summary Judgment on Shanghai Weston's Conversion Claim Because Weston Failed to Oppose the Motion.

The Court grants Tedia's motion for summary judgment on Count VIII because Weston failed to oppose it. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address

30

it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citations omitted).

### 7. Count IX: The Court Grants Summary Judgment on Shanghai Weston's Conspiracy Claim Because All of its Underlying Tort Claims Fail.

Because the Court has found that all of Weston's tort claims fail as a matter of law, its conspiracy claim fails as well. *See Shabazz v. ICWU Ctr. for Worker Health & Safety Educ.*, No. 1:18-cv-339, 2021 WL 6197402, at \*12 (S.D. Ohio Dec. 30, 2021) (quoting *Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013)) (holding that under Ohio law, "a civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy"); *see also Maxey v. State Farm Fire & Cas. Co.*, 689 F. Supp. 2d 946, 954 (S.D. Ohio 2010) (citation omitted) ("[I]n Ohio[,] breach of contract alone cannot serve as the underlying 'unlawful act' for a civil conspiracy.")

### B. The Court Denies in Part Shanghai Weston's Request for Summary Judgment on Tedia's First Counterclaim Because a Material Dispute Remains, but Grants it as to the Second.

Finally, Shanghai Weston also moves for summary judgment on Tedia's counterclaims. (Doc. 66-1, #1263–65). Because those two claims turn on the same facts as Weston's claims, they have largely been addressed above. But for clarity, the Court addresses them here.

### 1. The Court Denies Weston's Request for Summary Judgment on Tedia's Declaratory Judgment Request.

Citing Ohio Revised Code § 2721.05, Tedia requests declaratory judgment on four issues: (1) that "Tedia did not enter into a binding contract with Shanghai

31

Weston that required Tedia to utilize Shanghai Weston as its exclusive distributor of Tedia's products in China"; (2) that "Tedia has no legal, enforceable obligation to sell its products in China exclusively to Shanghai Weston"; (3) that "[t]he certificates attached as Exhibits A through I to Shanghai Weston's Complaint do not constitute or evidence an enforceable contract"; and (4) that "Shanghai Weston waived any potential claim based on Tedia's shipment of its products to Anhui Tedia for the fulfillment of the 2021 Purchase Orders by acquiescing and/or failing to object to that method of delivery when Tedia notified Shanghai Weston of the arrangement." (Doc. 29, #472–73).

The first three of those simply ask the Court to find that Tedia was not bound by an exclusive distributorship. And as discussed under Count I, there remains a material dispute over whether that was the case during the relevant years. (*See* supra Law & Analysis (L&A), Part A.1). And somewhat similarly, the fourth basically asks the Court to award judgment on Tedia's defense to Count II, and likewise, the Court above found there to be material dispute as to that defense. (*See* supra L&A, Part A.2). So summary judgment is denied on this counterclaim as well.

### 2. Count II: The Court Grants Weston Summary Judgment as to Tedia's Counterclaim for Breach of Contract.

Tedia's counterclaim for breach of contract is based on the same facts as its allegations of Weston materially breaching above—i.e., that Weston sold competing products while acting as Tedia's exclusive distributor. (Doc. 29, #473). The Court has considered this argument and found it to lack support. (*See* supra L&A, Part A.1.b).

32

So, consistent with that, the Court grants Weston's Motion for Summary Judgment on Tedia's breach of contract counterclaim. (Doc. 66-1, #1264–65).

## CONCLUSION

For these reasons, the Court **GRANTS** (in a limited fashion) Weston's request for summary judgment as to Tedia's breach of contract counterclaim and some elements of Counts I and II of the Amended Complaint, but **DENIES** the rest. (Doc. 66-1).[13] The Court **GRANTS** in part Tedia's request for summary judgment as to Counts III, IV, V, VI, VII, VIII, and IX, but **DENIES** it as to Count I. (Doc. 60).

**SO ORDERED.**

March 31, 2026
**DATE**                                    **DOUGLAS R. COLE**
                                            **UNITED STATES DISTRICT JUDGE**

---

[13] Because the Court granted Weston's Motion for Leave to File Corrective Motion for Partial Summary Judgment *Instanter*, (Doc. 66; 8/28/25 Min. Entry and Not. Order), the Court denies as moot Weston's original Motion for Partial Summary Judgment (Doc. 62)

33